**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Henry Daniel STULL, Sr., Henry Daniel Stull, Jr., and Patricia Mooradian,
Defendants-Appellants.**

Nos. 82–3478, 82–3481, 82–3823, 82–3824, 82–3825.

United States Court of Appeals,
Sixth Circuit.

Decided Sept. 17, 1984.

Argued June 12, 1984.

Rehearing and Rehearing En Banc
Denied Oct. 26, 1984.

Henry Daniel Stull, Jr., pro se.

Dan Polster (argued), Kenneth S. McHargh, Asst. U.S. Attys., Cleveland, Ohio, for plaintiff-appellee.

Jay B. White (argued), White, Milano & Miller, Cleveland, Ohio, for defendants-appellants in Nos. 82–3481 and 82–3823.

Donald N. Krosin (argued), Public Defender, Cleveland, Ohio, for defendants-appellants in No. 82–3824.

Terry Gilbert (argued), Friedman, Gilbert & Berezin, Cleveland, Ohio, for defendants-appellants in No. 82–3825.

Before KEITH and MARTIN, Circuit Judges, and SWYGERT, Senior Circuit Judge.*

SWYGERT, Senior Circuit Judge.

Defendant-appellants, Henry Daniel Stull, Sr. (Stull Sr. or Henry Stull), Henry Daniel Stull, Jr. (Stull Jr. or Daniel Stull), and Patricia Mooradian (Mooradian) were jointly indicted for mail fraud in violation of 18 U.S.C. § 1341. The twenty-count indictment charged the defendants with devising and executing a scheme to defraud through two interrelated vehicles—Mortgage or Financial Brokers Course and Skipper's Discount Company. The first nine counts referred to specific mailings in connection with the mortgage brokers program. The defendants were charged with inducing individuals to become mortgage brokers through false or fraudulent representations and with further causing the new brokers and their clients to submit advance fees to the Stull companies in reliance upon fraudulent representations. The remaining eleven counts referred to specific mailings in connection with Skipper's Discount Company. The defendants were charged with making false representations in order to obtain office equipment, office supplies, and other merchandise which enabled the defendants to carry out the mortgage brokers scheme. The indictment also alleged that Skipper's Discount Company had not paid for the merchandise, and had sent printed materials containing fraudulent statements to creditors in order to frustrate collection efforts.

The jury found each of the defendants guilty on all twenty counts. The district court originally sentenced Stull Sr. to one-hundred years imprisonment and imposed a fine of $20,000. Stull Jr. was sentenced to a fifty-year prison term and fined $20,000. Mooradian was originally sentenced to twenty-years imprisonment. The district court subsequently reduced Stull Sr.'s prison term to fifty years and Mooradian's prison term to ten years.

The defendants and their attorneys have raised a number of issues in appealing their convictions.[1] We have considered all the materials submitted to us and find their contentions to be without merit.

**I. Sufficiency of the Evidence**

The essential elements of mail fraud under 18 U.S.C. § 1341 are (1) a

---

* The Honorable Luther M. Swygert, Senior Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. Stull Sr. and Stull Jr. filed separate *pro se* appeals from the district court's order denying their pretrial motions to dismiss the indictment on grounds of prosecutorial misconduct and governmental bad faith. Appeals Nos. 82–3478 and 82–3481. Because the defendants have also challenged the indictment in their direct appeals of the convictions, we need not decide whether the district court's order is appealable. *See United States v. Griffin,* 617 F.2d 1342 (9th Cir.), *cert. denied,* 449 U.S. 863, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980).

Having considered the defendants' contentions relating to prosecutorial misconduct and governmental bad faith, we reject them for the reasons stated by the district court. The defendants' additional arguments that the indictment was defective, improperly obtained, and improperly returned are equally without merit.

The indictment set forth the elements of the crime, sufficiently informed the defendants of the charges against them, and was not duplicious. *See, e.g., United States v. Wexler,* 621 F.2d 1218, 1223 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 119, 66 L.Ed.2d 48 (1980); *United States v. London,* 550 F.2d 206, 210–13 (5th Cir.1977); *United States v. Laverick,* 348 F.2d 708, 714 (3d Cir.), *cert. denied,* 382 U.S. 940, 86 S.Ct. 391, 15 L.Ed.2d 350 (1965).

Nor do we find support in the record for the defendants' factual speculation that the indictment was improperly returned. *Cf. United States v. Daly,* 535 F.2d 434, 440 (8th Cir.1976). Furthermore, in the absence of a showing of good cause, the defendants' failure to object before trial to indictment defects, other than lack of jurisdiction and failure to charge an offense, constitutes a waiver. Fed.R.Crim.P. 12. *See also United States v. Viserto,* 596 F.2d 531, 538 (2d Cir.), *cert. denied,* 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); *United States v. Easom,* 569 F.2d 457, 459 n. 1 (8th Cir.1978).

scheme to defraud and (2) the mailing of material for the purpose of executing the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). In order to sustain a conviction, the government must also prove a defendant's intent to defraud. *United States v. Sedovic*, 679 F.2d 1233, 1238–39 (8th Cir.1982); *United States v. Pearlstein*, 576 F.2d 531, 537 (3d Cir.1978); *United States v. Payne*, 474 F.2d 603, 604 (9th Cir.1973). Direct evidence of fraudulent intent is not necessary; where sufficient circumstantial evidence is presented, the jury may properly infer that the defendant was culpably involved from his conduct, statements, and role in the overall operation. *United States v. Themy*, 624 F.2d 963, 965 (10th Cir.1980); *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir.1979); *Pearlstein, supra*, 576 F.2d at 541–46.

The defendants principally claim that the government failed to prove a scheme to defraud.[2] Mooradian also contends that there was insufficient evidence of her intent to defraud. Stull Jr. contends that there was insufficient evidence of his involvement in the mortgage brokers program.

■■■ When reviewing the sufficiency of the evidence, we must reverse only if the evidence is such that a reasonable mind could not find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–2789, 61 L.Ed.2d 560 (1979). In applying this standard, we must view the evidence in the light most favorable to the government giving full play to the jury's right to determine credibility, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Jackson, supra*, 443 U.S. at 319, 99 S.Ct. at 2789; *United States v. Stull*, 521 F.2d 687, 689 (6th Cir.

1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976).

Having reviewed the record in this case, we conclude that the evidence was sufficient to support the defendants' convictions on each count. The pattern of fraudulent statements and misrepresentations, and the close ties between the mortgage brokers program and Skipper's Discount Company warranted a finding of a general scheme to defraud. From the evidence the jury could also reasonably infer that each defendant intentionally participated in both aspects of the scheme. The government is not required to prove that each defendant was a mastermind of the scheme to defraud; proof of a defendant's willful participation in a scheme with knowledge of its fraudulent elements is sufficient. *Sedovic, supra*, 679 F.2d at 1238; *United States v. Price*, 623 F.2d 587, 591 (9th Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); *Pearlstein, supra*, 576 F.2d at 537. Nor is a defendant exonerated by the fact that he may have participated in the scheme to a lesser extent than others. *Stull, supra*, 521 F.2d at 689; *Blue v. United States*, 138 F.2d 351, 358 (6th Cir.1943), *cert. denied*, 322 U.S. 736, 64 S.Ct. 1046, 88 L.Ed. 1570 (1944). In this case the direct and circumstantial evidence relative to each defendant's statements and activities warranted the conclusion that a scheme to defraud existed and that each defendant joined in both facets of the scheme with the requisite intent.

What follows is not an exhaustive treatment of the evidence against each defendant but rather is a summary of their most significant statements and activities. The evidence showed that the defendants directed their business from their residence-offices in the Carlyle Towers, Lakewood, Ohio. Stull Sr. began the mortgage bro-

---

**2.** To the extent that the defendants base their challenge on the claim that the government failed to prove every allegation of a false statement contained in the indictment, they misapprehend what the government was required to prove. It is well established that proof of every allegation is not required in order to convict; the government need only prove that the

scheme to defraud existed. *See, e.g., United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979); *United States v. Amrep Corp.*, 560 F.2d 539, 546 (2d Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978); *United States v. Joyce*, 499 F.2d 9, 22–23 (7th Cir.), *cert. denied*, 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974).

kers program in 1976. Stull Jr. ordered cassettes and advertising for the program as early as 1978 and later worked full-time for the Stull enterprises. In testifying before the grand jury, he stated that he controlled Skipper's Discount Company.[3] Mooradian, who testified that her relationship with Stull Sr. was a marriage "without the piece of paper," was first employed by Stull Sr. in 1978. She was rapidly promoted to manager of the Fairview Park office and later to vice-president of several Stull entities. At trial she testified as to her supervisory role over the mortgage brokers program and the defendant's employees.

Through the mortgage brokers program, the defendants sold a mortgage broker course for a fee of $95.00 to approximately two thousand people. The course materials instructed the recipient how to set up business as a financial broker and solicit clients who needed funding for various projects. The materials further represented that brokers would earn sizeable commissions upon fundings of loan packages.

The course literature included photographs of Stull Sr. and Stull Jr., with a masthead listing Daniel Stull as president of Stull, Inc. and Henry Stull as vice-president. The materials represented that the defendants would use their personal expertise, world-wide financial network, and connections with financial institutions to help secure funding for loan packages. A brochure described the New York and Switzerland offices of Stull and Company, and stated that Stull Bank & Trust Co., "an offshore international bank being formed," could help "fill in the gap" in funding loans. The evidence at trial indicated that these "offices" were mail forwarding telephone answering services and that the "international bank" had no assets or deposits, nor was it licensed or chartered as a bank in the United States. In many documents the defendants also represented themselves as doctors, lawyers, brokers, and foreign diplomats. Each of the defendants admitted, however, that he or she was not licensed by any state to practice law or medicine and that their titles were conferred by "King Leonard" of the "Hutt River Province." [4]

The mortgage broker materials also advised new brokers to obtain advance fees from clients and forward either seventy percent of the fees to the Stull companies, or to forward the entire fee, in which case the defendants were to return thirty percent to the broker. The defendants' records showed that more than $140,000 in advance fees were obtained from various clients, and that most of that money was forwarded to the defendants. The evidence also indicated that the defendants often kept the entire advance fee.

Brokers and clients testified at trial about deceptive letters from and telephone conversations with the defendants. One loan applicant stated that Stull Sr. told him his loan would be funded in thirty days at an interest rate of twelve percent; a broker testified that Stull Sr. told him that Stull & Co. would fund his clients' loans in thirty to forty-five days. In a lengthy letter to another broker, Stull Jr. described the defendants' supposed efforts to fund his clients' loans; the letterhead was captioned "Stull & Stull Attorneys." Another broker testified that Mooradian told him ninety-six percent of the loans sent to Stull & Co. were funded. When testifying before the grand jury, Stull Sr. was unable to identify a single loan that Stull & Co. had funded, and Mooradian was unable to name a single capital source that had funded a loan through Stull & Co.

Through Skipper's Discount Company, the defendants obtained office equipment and supplies, and other services on credit from numerous companies around the country. Skipper's Discount Company was represented as a wholesale company that sold products to business customers.

---

**3.** Excerpts from each of the defendant's voluntary testimony before the grand jury were introduced into evidence at trial.

**4.** "King Leonard" is a farmer in Australia who purports to have seceded from Australia. His "kingdom" is not recognized by Australia or any other nation.

When the orders were sent another document was included which stated that Skipper's Discount Company's net worth was "five million dollars" and that it projected a sales volume of ten million dollars for fiscal year 1981–82. The evidence at trial indicated that the defendants sold nothing; they used the products for themselves and for the mortgage brokers program.

When the suppliers attempted to collect for their products, the defendants sent them misleading letters and other fraudulent documents. The letters told creditors that Skipper's Discount Company had been acquired by Omar Mohammed Abdul Oil Company. More than eight months after the defendants began mailing these letters, Stull Jr. told the grand jury that Omar Mohammed Abdul Oil Company had not yet been licensed to do business; a former employee of the defendants testified that the company did not exist.

To further deceive creditors, Omar Mohammed Abdul Oil Company sent letters telling them to send all correspondence and further billings to "Abe Powell," a fictitious name, at a Wilmington, Delaware address. Former employees testified that this address was a "mail drop" and that the mail was forwarded to Penthouse 2 at Carlyle Towers, the office of Stull Sr. and Mooradian. The defendants also sent UCC lien forms to creditors indicating that certain products bought by Skipper's Discount Company had been assigned to Sherman International Bank, another of the defendants' fictitious entities. Mooradian admitted that she had signed the forms as "Dr. P.C. Moore, wnc," vice-president and attorney for the bank. Her involvement in the scheme was further demonstrated by a letter she sent to Dun & Bradstreet, giving "legal notice" that neither Daniel Stull nor Henry Stull were officers, directors, or stockholders of Skipper's Discount Company, or Stull & Co.[5]

In sum, we conclude that the evidence was of such substantiality that the jury could find the defendants guilty beyond a reasonable doubt on all counts.

## II. The Mail Fraud Statute

The defendants argue that under the terms of 18 U.S.C. § 1341, a single scheme to defraud constitutes a single violation of the statute regardless of the number of uses of the mail in furtherance of the scheme. Consequently, they contend that they could each be convicted and sentenced for only one offense because the Government sought to prove a single scheme to defraud in this case.

The defendants principally rely on cases that have interpreted different language in other statutes. *See Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955) (Mann Act); *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952) (Fair Labor Standards Act). They acknowledge that they have found no case construing the mail fraud statute which has espoused their proposed interpretation. Indeed, courts for many years have consistently held that each mailing in furtherance of a scheme to defraud is a separate offense under 18 U.S.C. § 1341. *See, e.g., United States v. Ledesma,* 632 F.2d 670 (7th Cir.), *cert. denied,* 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980); *Hanrahan v. United States,* 348 F.2d 363 (D.C.Cir.1965), *cert. denied,* 389 U.S. 845, 88 S.Ct. 95, 19 L.Ed.2d 111 (1967); *Milan v. United States,* 322 F.2d 104 (5th Cir.1963), *cert. denied,* 377 U.S. 911, 84 S.Ct. 1174, 12 L.Ed.2d 181 (1964). *See also Badders v. United States,* 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706 (1916); *Stumbo v. United States,* 90 F.2d 828 (6th Cir.), *cert. denied,* 302 U.S. 755, 58 S.Ct. 282, 82 L.Ed. 584 (1937). Use of the federal mails is not only a jurisdictional requirement, it is the gist of the crime of mail fraud. *United States v. Weatherspoon,* 581 F.2d 595, 601–02 (7th Cir.1978); *Atkinson v. United States,* 344 F.2d 97 (8th Cir.), *cert. denied,* 382 U.S. 867, 86 S.Ct. 141, 15 L.Ed.2d 106 (1965). Each use of the mails in furtherance of a

---

**5.** We also note that the jury had ample opportunity to assess Mooradian's credibility and the extent of her knowledge of the Stull activities from her lengthy testimony at trial.

scheme to defraud therefore may be separately and cumulatively punished. In this case, the defendants' convictions and sentences were within the terms of the statute.

### III. Exclusion of Evidence

In April 1981 the United States Postal Service initiated a civil proceeding against several Stull companies, including the mortgage brokers program. As part of the administrative action, the defendants negotiated with the postal service and subsequently modified or eliminated several representations in the course materials. At trial they sought to introduce testimony regarding the civil proceeding but were prevented from doing so. They now contend that the trial court erred in excluding this testimony and in limiting Stull Jr.'s examination of certain witnesses regarding such topics as problems with suppliers and payments to creditors. They argue that the excluded evidence was relevant to their good faith defense and that its exclusion was prejudicial.

▆▆▆ Because the trial court's determinations of relevancy depend on the exercise of considerable judgment within the context of the entire trial, appellate courts will not lightly overrule the trial court's decision. *Post v. United States*, 407 F.2d 319 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1969). Finding no abuse of discretion in this case, we uphold the district court's rulings. That the defendants negotiated with the postal service in order to preclude civil sanctions is, at best, only marginally probative of their good faith belief in the legitimacy of

their business and their willingness to cooperate with authorities. In fact no consent agreement was ever reached, and the civil action was dismissed when the defendants sought to depose a postal inspector involved in the grand jury proceedings. Moreover, "the possibilities of confusion and false deductions from circumstances of nebulous significance are real dangers that cannot be casually ignored." *Post, supra,* 407 F.2d at 323. *See also United States v. Wilkinson,* 460 F.2d 725 (5th Cir.1972). Here the potential confusion engendered by lengthy testimony about an administrative action (which the defendants knew did not preclude criminal penalties) was properly avoided. Finally, the essence of the desired testimony was introduced, eliminating the potential for harm from the exclusion. *See United States v. Freeman,* 619 F.2d 1112 (5th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981); *United States v. Habel,* 613 F.2d 1321, 1325–26 (5th Cir.), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). Mooradian testified that the defendants had worked with postal inspectors to clear up any areas that clients might misunderstand, and had removed certain statements from their materials. Stull Jr. also elicited testimony from witnesses regarding problems with suppliers and payments made by Skipper's Discount Company.

### IV. Instructions to the Jury

The defendants primarily object to the jury instructions on the defense of good faith [6] and the definitions of "scheme to defraud" and false statements.[7] They fur-

---

**6.** The instruction on the good faith defense stated in part:

You are instructed that good faith on the part of a defendant is a defense to a charge of mail fraud.

"Good faith," as used as a possible defense in a mail fraud prosecution, is defined as a genuine belief at the time each alleged false statement or representation was communicated, that each such statement or representation was true.

*"Good faith" does not include the defendant's belief or faith that the venture will even-*

*tually meet his or her expectations.* (emphasis added)

**7.** These challenged instructions stated as follows:

A "scheme to defraud" is not defined according to a technical standard but a standard which is a reflection of moral uprightness, fundamental honesty, fair play and right dealing in the general business life of members of society.

A statement or representation is false or fraudulent if the maker of the statement knows it to be untrue; if the person making it

ther contend that the district court erred in refusing to instruct the jury that good faith includes a defendant's belief or faith that a venture will eventually succeed no matter how impractical or visionary the venture may be. *See Hawley v. United States,* 133 F.2d 966 (10th Cir.1943).

■■■ We find no error in the jury instructions. Since *Hawley* was decided, courts have consistently held that a defendant's honest belief in the ultimate success of a venture is not in itself a defense to a charge of mail fraud. *Beecroft, supra,* 608 F.2d at 757; *United States v. Amrep Corp.,* 560 F.2d 539, 547 (2d Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978); *United States v. Diamond,* 430 F.2d 688 (5th Cir.1970). Furthermore, the Tenth Circuit in discussing the *Hawley* instruction has made clear that "no matter how firmly the defendant may believe in the plan, his belief will not justify baseless, false, or reckless representations or promises." *Sparrow v. United States,* 402 F.2d 826, 828 (10th Cir.1968). With respect to the challenged instruction on "scheme to defraud," we note that this court has previously approved the definition of this element as set forth by the district court. *United States v. VanDyke,* 605 F.2d 220, 225 (6th Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979). The defendants have given us no persuasive reason for overruling our earlier decision. Finally, the district court's definition of false statements likewise conformed to the prevailing legal standard. *See United States v. Frick,* 588 F.2d 531, 536 (5th Cir.), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979); *Amrep Corp., supra,* 560 F.2d at 543; *Irwin v. United States,* 338 F.2d 770, 774 (9th Cir. 1964), *cert. denied,* 381 U.S. 911, 85 S.Ct. 1530, 14 L.Ed.2d 433 (1965).

## V. Severance

Several times during the trial each defendant moved for relief from prejudicial

joinder of counts and of defendants pursuant to Fed.R.Crim.P. 14. They now argue that the district court's denial of their motions for severance of the defendants created substantial prejudice and constituted an abuse of discretion. They claim prejudice from the "spillover" effect of evidence against each codefendant and from the inability to compel exculpatory testimony from their codefendants. Mooradian and Stull Sr. also claim prejudice from Stull Jr.'s *pro se* representation at trial; Mooradian claims further prejudice as a result of her inability to introduce exculpatory sections of her grand jury testimony due to *Bruton* considerations. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

■■■ There is no question that the defendants were properly indicted together for twenty counts of mail fraud under Fed. R.Crim.P. 8. As a general rule, persons jointly indicted should be tried together.[8] *United States v. Licavoli,* 725 F.2d 1040, 1051 (6th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); *United States v. Dye,* 508 F.2d 1226, 1236 (6th Cir.1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975). The district court may grant a severance if it appears that a defendant is prejudiced by the joinder. Fed.R.Crim.P. 14. The refusal to do so, however, will be overruled on appeal only if a clear abuse of discretion is demonstrated. *Licavoli, supra,* 725 F.2d at 1051; *United States v. Hamilton,* 689 F.2d 1262, 1275 (6th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983). The defendants have the burden of showing compelling prejudice. *Id.*

■■ Having reviewed the trial transcript, we conclude that the defendants have not met their burden. The charges against each of the defendants were proved by substantially the same witnesses and documents. There was proof of how the

---

does so without regard to whether it is true or false; if it is put forth without a reasonable basis; *or if it is made with reckless indifference as to truth or falsity.* (emphasis added).

**8.** Under the mail fraud statute, a scheme to defraud shared in by two or more persons constitutes a conspiracy. *Blue, supra,* 138 F.2d at 351.

defendants worked together and of each defendant's role in both facets of the scheme. The jury was also properly instructed to give separate, personal consideration to the case of each individual defendant. *See United States v. Reed,* 647 F.2d 678, 689 (6th Cir.), *cert. denied,* 454 U.S. 837, 102 S.Ct. 142, 70 L.Ed.2d 118 (1981); *United States v. Lutz,* 621 F.2d 940, 945 (9th Cir.1980), *cert. denied,* 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75 (1981).

Nor do we find substantial prejudice from the defendants' inability to call each other as witnesses or from Mooradian's inability to admit all of her grand jury testimony. The jury heard Stull Sr.'s grand jury testimony claiming full responsibility for the mortgage brokers program and Stull Jr.'s grand jury testimony claiming full responsibility for Skipper's Discount Company. They also heard Mooradian's testimony attempting to convince the jury that the business was legitimate, and that she worked at the direction of both Stulls and believed what they told her. Even assuming the defendants would be willing to testify at separate trials, we see no reason why a jury would then give greater credence to their testimony than was given to the grand jury statements and actual testimony in the joint trial.

We also find no compelling prejudice resulting from Stull Jr.'s *pro se* representation at trial. He was assisted by counsel throughout, and it appears from the record that the three defendants consulted together and presented a coordinated defense.

Although there were frequent outbursts of laughter in the courtroom when Stull Jr. referred to "King Leonard" and "Hutt River Kingdom" in presenting his defense,[9] the jury was already acquainted with both through the statements of prosecution witnesses and the defendants' grand jury testimony. Stull Jr.'s cross-examination may have been less than artful and may have produced damaging testimony; however, the statements of a witness called by Stull Sr. were more devastating.

Even considering the cumulative effect of the defendants' claims of prejudice from joinder, we conclude that the district court did not abuse its discretion in denying the motions for severance.

## VI. Other Issues

In their *"pro se"* brief, the defendants have presented several other grounds for reversing their convictions as well as additional arguments on issues we have addressed above. We have considered all their contentions, but find them meritless, warranting no further discussion.

Finally, we, *sua sponte,* urge the trial judge to give serious consideration, if a renewed motion under Fed.R.Crim.P. 35 is made, to a substantial reduction of the sentences given each defendant. There is something to be said about the inadvisability of consecutive maximum sentences on a multiple-count mail fraud prosecution. Moreover, the comparison of the sentences given these defendants with the average sentence in other mail fraud cases mitigates in favor of a reduction.[10]

9. Related to this claim of prejudicial joinder, the defendants also contend they were denied a fair trial by the "circus-like" atmosphere of the courtroom and the district court's general bias against them. This aspect of the trial was discussed extensively at oral argument, prompted mainly by questions from the panel. Defense counsel asserted that the trial was "bizarre" and complained that Stull Jr. "took over the trial." We have carefully reviewed the entire transcript in order to satisfy ourselves that the defendants received a fair trial. Although the district judge might have done more to eliminate the outbursts of laughter, we believe that the trial, as a whole, was taken seriously by the district judge and that his control over the courtroom was at least adequate.

10. From July 1, 1981 to June 30, 1982, 895 defendants were convicted under 18 U.S.C. § 1341; 392 defendants (44%) were sentenced to imprisonment, 359 defendants (40%) were placed on probation, 127 defendants (14%) were given a split sentence (defined as a sentence of six months or less imprisonment to be followed by a term of probation), 15 defendants (2%) were fined only, and 2 defendants received other sentences (including sentence suspended, suspended fines, sentenced to time already served, etc.). For those defendants sentenced to imprisonment (not including those receiving a split sentence), the average prison sentence was 46 months and the mean prison sentence was 36 months. (The figures for prison sentences reflect the total sentence received, with no distinc-

It is axiomatic that the imposition of sentences within the statutory limits lies almost entirely within the discretion of the trial judge; however, we cannot refrain from observing that to us the sentences here imposed seem unduly harsh. *See Wilson v. United States*, 335 F.2d 982, 984 (D.C.Cir.1963); *Scarbeck v. United States*, 317 F.2d 546, 569 (D.C.Cir.1962), *cert. denied*, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963).

We affirm each defendant's conviction.

tion made between those defendants convicted on multiple counts and those convicted on a single count.) Administrative Office of the United States Courts, *United States District Courts Sentences Imposed Chart Twelve Month Period Ended June 30, 1982* (1982).

From July 1, 1980 to June 30, 1981, 857 defendants were convicted under 18 U.S.C. § 1341; 321 defendants (37%) were sentenced to imprisonment, 364 defendants (42%) were placed on probation, 145 defendants (17%) received a split sentence, 26 defendants (3%) were fined only,

and one defendant received another sentence. For those defendants sentenced to imprisonment, the average prison sentence was 42 months and the mean prison sentence was 36 months. Administrative Office of the United States Courts, *United States District Courts Sentences Imposed Chart Twelve Month Period Ended June 30, 1981* (1982).